

**SO ORDERED.**

**SIGNED this 07 day of July, 2006.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHANCE INDUSTRIES, INC. | ) | Case No. 01-11698-11 |
| CHANCE RIDES, INC. | ) | Case No. 01-12000-11 |
| CHANCE ENGINEERING, INC., | ) | Case No. 01-12002-11 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| JESSE T. WHITE, MARCUS WHITE, | ) | |
| MELISSA WHITE, PATRICK A. MALONE, | ) | |
| ARI S. CASPER, and WOODY IGOU, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. No. 05-5591 |
| | ) | |
| CHANCE INDUSTRIES, INC.; CHANCE | ) | |
| RIDES, INC.; CHANCE ENGINEERING, INC.; | ) | |
| and RICHARD G. CHANCE, | ) | |
| Defendants, | ) | |
| v. | ) | |
| | ) | |
| FRANK JOSEPH & SON, INC. d/b/a | ) | |
| JOLLY SHOWS, | ) | |
| Intervenor | ) | |
| _____ | ) | |

1

## MEMORANDUM OPINION AND ORDER

Plaintiffs seek a determination from this Court that minor plaintiff Jesse White's (Jesse) personal injury lawsuits against defendants in Maryland state court were not discharged by this Court's May 16, 2002 Order Confirming Debtors' Second Amended Plan of Reorganization ("Confirmation Order").[1] Debtors filed a motion to enforce the Confirmation Order, seeking to enjoin the prosecution of Jesse's lawsuits and to hold plaintiffs and their attorneys in contempt for violation of the Confirmation Order and the discharge injunction of 11 U.S.C. § 524.[2] Plaintiffs objected and responded by filing this adversary proceeding.

Nature of Case

These matters present a question of first impression in this District and the Tenth Circuit: whether a party's post-confirmation state court product liability action is discharged by a confirmation order where the party was injured post-confirmation by debtors' and defendants' alleged prepetition conduct. Jesse alleges that he sustained a permanent brain injury from riding an amusement ride known as the Zipper on June 15, 2002 at a carnival in Maryland. Jesse was 8 years old at the time of the incident. The Zipper was manufactured and sold prepetition by debtors to Frank Joseph & Sons, Inc. d/b/a Jolly Shows ("Jolly Shows"), which owned and operated the Zipper at the Maryland carnival. In 2005, shortly before the expiration of the statute of limitations, Jesse brought suit against debtors and others in Maryland state court.

This adversary proceeding was submitted to the Court on stipulated facts and briefs. The

---

[1] Case No. 01-11698, Dkt. 517.

[2] Case No. 01-11698, Dkt. 672.

2

Court took the matter under advisement and is now prepared to rule.

Jurisdiction

This matter requires the Court to construe the Confirmation Order, 11 U.S.C. § 524 and § 1141 to determine whether unknown future tort/product liability claims that accrue post-confirmation are discharged by the Confirmation Order.[3]  It also calls for the Court to determine whether plaintiffs are in contempt for allegedly violating the Confirmation Order by commencing personal injury lawsuits in Maryland state court.  As such, it is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) and (L) and it "arises in" the bankruptcy case.[4]  This Court has subject matter jurisdiction.[5]

The Parties

Plaintiff Jesse White is the minor child of plaintiffs Marcus and Melissa White.  Plaintiffs Patrick A. Malone, Ari S. Casper, and Woody Igou are the attorneys representing the White family and on whose behalf they filed two lawsuits in Maryland state court for Jesse's alleged injury from the Zipper.  For ease of reference, the Court will refer to the plaintiffs as "Jesse" or "White,"

_____

[3]  Under Article 9 of the confirmed plan, the Court retained jurisdiction to resolve contested matters brought by Chance and to issue an injunction against any activity interfering with implementation, or enforcement of the plan or Confirmation Order.  Dkt. 472.

[4]  *See In re Jacobs*, 149 B.R. 983 (Bankr. N.D. Okla. 1993) (debtor's adversary proceeding against state insurance commissioner seeking to enjoin proceedings to revoke debtor's insurance agent license on grounds that proceedings violated discharge injunction was a core proceeding; an action to determine the scope of the § 524 discharge and enforcing the discharge arises under and arises in a case under Title 11); *In re Blue Diamond Coal Co.*, 163 B.R. 798 (Bankr. E.D. Tenn. 1994) (adversary proceeding involving construction and implementation of confirmed chapter 11 plan constituted core proceeding; bankruptcy court has authority to construe terms of chapter 11 plan that it confirmed and to ensure that plan is properly executed and consummated).

[5]  28 U.S.C. § 157(b)(1) and § 1334(b).

3

whether used singularly or collectively.

Defendants Chance Industries, Inc., Chance Rides, Inc., and Chance Engineering, Inc. are chapter 11 debtors, having filed for bankruptcy relief under chapter 11 on April 17, 2001 (Chance Industries, Inc.) and May 1, 2001 (Chance Rides, Inc. and Chance Engineering, Inc.). Chance Rides and Chance Engineering are wholly owned subsidiaries of Chance Industries. The bankruptcy court substantively consolidated the three chapter 11 cases on August 8, 2001. The debtors became the reorganized debtor Chance Industries, Inc. under the plan of reorganization. The Court will refer to the reorganized debtor and debtor entities interchangeably as "Chance." Chance has manufactured and sold amusement rides for the amusement park and carnival industry since 1961. In 1997, Chance manufactured and sold the Zipper ride in question.

Defendant Richard G. Chance is the president of Chance Industries, Inc. as well as the successor entity in Chance's plan of reorganization – Chance Rides Manufacturing, Inc. ("CRM"). He owns 100% of CRM and 98% of Chance Industries, Inc. Under the terms of Chance's second amended plan dated April 12, 2002, substantial assets and liabilities of Chance were transferred to CRM. Richard G. Chance and CRM were named defendants in the Maryland state court actions brought by Jesse.

Frank Joseph & Sons, Inc. d/b/a Jolly Shows ("Jolly Shows") purchased the Zipper ride from Chance in 1997 and owned and operated the Zipper ride at the time of Jesse's injury. Jolly Shows was also named as a party defendant in the Maryland state court action. Jolly Shows intervened in this adversary proceeding and joins in Jesse's argument that post-confirmation claims were not discharged by the Confirmation Order. Jolly Shows seeks to assert indemnity cross-claims against Chance and CRM in the Maryland state court action.

<u>The Maryland Lawsuits</u>

On May 16, 2005, Jesse filed a personal injury lawsuit against Chance Industries, Inc., CRM, and Jolly Shows in Maryland state court (Case No. C-05-105898). On June 14, 2005, Jesse filed a second personal injury lawsuit against Richard G. Chance personally in Maryland state court (Case No. C-05-106516). In general, Jesse alleges in both cases that the Zipper was negligently designed and manufactured due to an inadequate restraint system and cushioning and that the defendants negligently failed to warn potential riders of the risks associated with riding the Zipper.

<u>Findings of Fact</u>

The following facts are established by the parties' stipulations and exhibits attached thereto.[6]

The Chance debtors filed their chapter 11 petitions in 2001. The bankruptcy court substantively consolidated the three cases.[7] On April 12, 2002 Chance filed its Second Amended Disclosure Statement and Plan of Reorganization.[8] Under Chance's Second Amended Plan, most of Chance's assets were transferred to the newly formed entity CRM in exchange for CRM's assumption of certain obligations of Chance. CRM would continue to manufacture the product lines assigned to it under the plan, as well as the product line retained by the reorganized debtor Chance Industries, Inc.

Article 4.A. implements Chance's plan by providing for the transfer of assets from Chance to CRM:

> The Debtors will, pursuant to 11 U.S.C. § 363(f), and 11 U.S.C. § 1123(a)(5)(B) or (D), transfer the following assets, free and clear of liens, interests,

---

[6] No. 05-5591, Dkt. 54.

[7] No. 01-11698, Dkt. 213.

[8] No. 01-11698, Dkt. 491 and 492.

5

or claims (except where otherwise provided) to Chance Rides Manufacturing, Inc. ("CRM"):

Article 8 of Chance's plan pertaining to discharge provides, in relevant part:

> Except as provided in this Plan or Confirmation Order, confirmation will discharge the Debtors of all claims or other debts which arose, accrued, or grew out of acts performed by the Debtors before the Effective Date [the date on which the Confirmation Order becomes final and no appeal is pending] . . . whether or not a proof of claim is filed, the claim is allowed, or the holder of the claim accepts the Plan. . . . The discharge will void any judgment obtained against the Debtors at any time, to the extent such judgment relates to a discharged claim. Except as provided in the Plan, all entities which have held, currently hold, or may hold a claim or other debt liability that is discharged will be permanently enjoined from taking any action to enforce such claim, including commencement or continuation of legal action . . .

Article 10 of Chance's plan further provides:

> **B. Post-Petition, *Pre-Confirmation*[9], Products Liability/Personal Injury**
> The Debtors have been made aware of accidents or incidents occurring post-petition involving an amusement ride or other product manufactured or marketed by the Debtors. The Debtors have amended the matrix to give notice of the bankruptcy to all parties involved, to the extent they were able to discover the same. Any claim arising from a post-petition accident or incident will conclusively be presumed to be a pre-petition claim in that any action of the Debtors giving rise to the claim occurred pre-petition.

Under the second amended plan, tort and product liability claims were classified as Class 6 claims, along with other general unsecured claims.[10] The plan provided that each holder of an "Allowed Unsecured Claim" would be paid pro rata from an Unsecured Claim Reserve.[11] This Unsecured Claim Reserve was the exclusive source of payment of unsecured claims and was to be

---

[9] Dkt. 492 [Emphasis added].

[10] Dkt. 492, p. 6.

[11] Dkt. 492, p. 19.

6

funded by recoveries from avoidance actions.[12] Allowed Administrative Claims and Allowed

Priority Claims were to be paid ahead of Allowed Unsecured Claims from the Unsecured Claim

Reserve. An "Allowed [Unsecured] Claim" was defined as a claim allowed in a particular class or

category. As defined in Chance's plan, an "Allowed Claim" meant a claim listed by one of the

debtors in its schedules (except disputed, contingent or unliquidated claims), a claim for which a

proof of claim has been filed by the bar date, a claim stipulated as allowed by debtor, or a claim

allowed by the Court.[13] The term "claim" was not otherwise defined in the second amended plan.

Chance's second amended plan was confirmed May 16, 2002. The Confirmation Order

contains similar language regarding discharge as contained in Article 8 of the second amended plan:

> Except as provided in the Plan or this Order, the Debtors are discharged of all claims
> or other debts which arose, accrued or grew-out-of acts performed by the Debtors
> before the Effective Date of the Plan, . . . whether or not a proof of claim is filed, the
> claim is (deemed) allowed, or the holder of the claim accepts the Plan. The
> discharge voids any judgment obtained against the Debtors at any time, to the extent
> such judgment relates to a discharged claim. Except as provided in the Plan or this
> Order, all entities which have held, currently hold, or may hold a claim or other debt
> liability that is discharged are permanently enjoined from taking any action to
> enforce such claim, including commencement or continuation of legal action;
> creating, perfecting or enforcing any lien against property of the Debtors', the
> Reorganized Debtor [Chance Industries, Inc.], their assignees or successors; or
> asserting a set-off, right-of-subrogation, or recoupement [sic] of any kind against any
> debt, liability, or obligation due the Debtors, the Reorganized Debtor, the assignees
> or successors of the same.[14]

It further provides that "[a]ll those assets of the Debtors which the Plan provides to be transferred

to Chance Rides Manufacturing, Inc. ("CRM") are hereby vested in CRM free and clear of the

---

[12] Dkt. 492, p. 22, 25. Debtor estimated the range of recovery from possible avoidance actions of $250,000 to $750,000.

[13] Dkt. 492, Art. I, ¶ A.2.

[14] No. 01-11698, Dkt. 517, ¶ 14.

claims of any creditor, except as set out in the Plan or this Order."[15]

On June 15, 2002 eight year old Jesse attended a carnival in Pasadena, Maryland and rode the Zipper ride. The Zipper was manufactured and sold by Chance to Jolly Shows in 1997. Jolly Shows owned and operated the Zipper at the time that Jesse rode the ride. Jesse alleges that he was injured, suffering a permanent brain injury, as a result of riding the Zipper. Prior to June 15, Jesse had not ridden the Zipper and had no contractual or legal relationship with Chance.

In May and June of 2005, Jesse commenced two personal injury lawsuits in Maryland state court, suing Chance, its successor - CRM, Richard Chance, and Jolly Shows. Neither Jesse nor his parents had notice or knowledge of Chance's bankruptcy case prior to the Confirmation Order. On June 2, 2005, after the first lawsuit was filed, Chance's bankruptcy attorney wrote Jesse's attorney, advising him of the terms of the Confirmation Order and demanding a dismissal of the lawsuit against Chance and CRM. Jolly Shows had notice and knowledge of Chance's bankruptcy prior to the Confirmation Order.[16]

Chance has no insurance coverage for Jesse's claims. CRM has limited indemnity insurance coverage for Jesse's claims. In the bankruptcy case, all assets of the estate have been collected and all avoidance actions have been completed. No funds were recovered and available for distribution to unsecured creditors.

When Jesse failed to dismiss the lawsuits against Chance and CRM, Chance filed a motion for contempt and to enforce the Confirmation Order by enjoining Jesse's prosecution of the

---

[15] No. 01-11698, Dkt. 517, ¶ 13.

[16] Jolly Shows was added to Chance Industries, Inc.'s matrix in October of 2001. Case No. 01-11698, Dkt. 308.

Maryland actions.[17]  Jesse responded by filing this adversary proceeding for declaratory judgment,

seeking a determination that his claims asserted in the Maryland actions were not discharged by the

Confirmation Order.

<u>Summary of Parties' Arguments</u>

Because the various defendants in the Maryland state court action stand in different positions

vis-a-vis Jesse, the Court believes it is beneficial to briefly summarize the parties' contentions.

Jesse contends that his future tort claims are not claims within the meaning of § 101(5),[18]

where the claimant is not identifiable at the time of confirmation because he has yet to be injured

and there is absent any pre-petition contact, relationship, or exposure to Chance or the product that

caused the injury.  Jesse further argues that if his future tort claim is encompassed by the definition

of claim in § 101(5), the discharge of that claim without notice and a meaningful opportunity to be

heard violates his due process rights guaranteed by the United States Constitution.  Jesse further

notes that Richard Chance was not a debtor in bankruptcy and the Confirmation Order has absolutely

no effect on the claims asserted against Richard Chance.  For the same reason, Jesse's claims against

Jolly Shows are unaffected by the Confirmation Order.

Chance and CRM counter that the intentionally broad definition of claim in § 101(5) does

indeed include post-confirmation contingent claims such as Jesse's.  Citing *In re Parker*[19] and the

"conduct test," Chance argues that the Court must determine whether Jesse had a claim prepetition

by examining whether  the conduct which gives rise to the alleged claim occurred prepetition and

---

[17]  No. 01-11698, Dkt. 672.

[18]  Future statutory references are to the Bankruptcy Code, Title 11, U.S.C. § 101 *et seq.* unless otherwise noted.

[19]  264 B.R.685 (10th Cir. BAP 2001), *aff'd* 313 F.3d 1267 (10th Cir. 2002)

9

not when Jesse's cause of action accrued under state law. They further argue that Jolly Shows is precluded by the Confirmation Order from asserting cross claims because it had pre-confirmation notice of the bankruptcy. As for Jesse's due process argument Chance and CRM contend that any constitutional violations were "harmless error" because the outcome of the Confirmation Order would have been no different if Jesse would have had notice and participated in confirmation. Chance and CRM place the burden on Jesse to show that the due process violations were not harmless error. Finally, with respect to Richard G. Chance, defendants state that the claims asserted against him in a separate action are identical to those asserted against the debtor and it is therefore appropriate to enjoin the action against him to protect the debtor.

Jolly Shows advocates the same arguments advanced by Jesse to permit Jolly Shows to assert unspecified cross-claims against its co-defendants Chance in the Maryland suits. Jolly Shows, however, stands in slightly different shoes from Jesse in that it had notice of the Chance bankruptcy before the Confirmation Order was entered and in fact had a pre-petition relationship with Chance due to its purchase of the Zipper ride in 1997. Jolly Shows therefore focuses its argument on the constitutionality of discharging the post-confirmation claim of Jolly Shows. As to CRM, the successor entity, Jolly Shows argues that only Chance's in rem interests were transferred to the successor entity CRM free and clear under § 363(f); in personam liabilities were not transferred free and clear of liens, interests, or claims. Jolly Shows also suggests that it may have direct claims against CRM arising out of its post-confirmation conduct (*i.e.* CRM's own failure to warn of the inadequate restraint system and risks in riding the Zipper).

10

<u>Analysis</u>

The Court begins its analysis with a review of § 524 and § 1141 and the definitions of "debt" and "claim" under the Bankruptcy Code.

Section 524 describes the effect of receiving a *discharge*.  It states, in relevant part:

(a) A discharge in a case under this title -

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to *any debt discharged* under section . . . 1141 . . . of this title, whether or not discharge of such debt is waived; [Emphasis added.]

(2) operates as an injunction against the commencement or continuation of an action, . . .or an act, to collect, recover or offset any such *debt* as a personal liability of the debtor, whether or not discharge of such debt is waived; [Emphasis added.]

\* \* \*.

(e) Except as provided in subsection (a)(3) of this section, *discharge of a debt of the debtor* does not affect the liability of any other entity on, or the property of any other entity for, *such debt*. [Emphasis added.]

A *debt* is defined in § 101(12) to mean "liability on a claim."  A *claim* is broadly defined in § 101(5) as a "right to payment" and includes a right to payment that is unliquidated, contingent, unmatured, disputed, legal, equitable, or unsecured.  The Court notes that Chance's Confirmation Order did not provide for a channeling injunction or the establishment of a trust to pay claims in the manner described in § 524(g) and adopted in other cases.[20]

Section 1141 describes the effect of *confirmation* of a plan of reorganization.  It provides, in relevant part:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, . . . any entity acquiring property under the plan,

---

[20]  Section 524(g) specifically applies to asbestos tort litigation, but there is no reason that a channeling injunction cannot be used to balance the rights of debtors and future claimants in other cases.

11

and any creditor, equity security holder, . . . whether or not the claim or interest of such creditor, equity security holder . . . is impaired under the plan and whether or not such creditor, equity security holder . . . has accepted the plan.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors[21], equity security holders, and of general partners in the debtor.

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan -
        (A) discharges the debtor *from any debt that arose before the date of such confirmation*, and any debt of a kind specified in section 502(g), 502(h), or 502(I) of this title . . . [Emphasis added.]


I.      **The *Parker* Case.**

The Court will first consider whether Jesse's personal injury lawsuit is a claim within the meaning of § 101(5). Because Chance and CRM rely heavily on *In re Parker* for their contention that it is, the Court has closely reviewed both the Tenth Circuit Bankruptcy Appellate Panel (BAP) decision[22] and the Tenth Circuit Court of Appeals decision.[23] *Parker* appears to be the lone Tenth Circuit authority for determining when a claim is a pre-petition claim and therefore discharged by the debtor's bankruptcy and when it is a post-petition claim and not discharged by debtor's bankruptcy.

*Parker* involved a former client's (Watson) legal malpractice claim against her attorney, a debtor in a no asset chapter 7 case. The malpractice claim arose from pre-petition events where

---

[21]  A creditor is defined in § 101(10) as an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. A person is an "entity" under § 101(15).

[22]  *Parker v. Watson (In re Parker)*, 264 B.R. 685 (10th Cir. BAP 2001).

[23]  313 F. 3d 1267 (10th Cir. 2002), *cert denied* 540 U.S. 965 (2003).

12

debtor filed an employment lawsuit on behalf of Watson in federal court but failed to serve the defendant, resulting in dismissal of the lawsuit. Debtor filed a voluntary chapter 7 petition approximately six months after the employment lawsuit was dismissed, and received a discharge on May 14, 1998.[24] When Watson filed a state court malpractice lawsuit against debtor in July of 1998, debtor answered that the claim was discharged in his bankruptcy. A motion to reopen the bankruptcy case and obtain a determination that the malpractice claim had been discharged under § 727(b) followed.

The court held that Watson's malpractice claim was not excepted from the debtor's discharge under § 523(a)(3)(A) because debtor's chapter 7 case was a no asset case with no claims bar date set.[25] The court then focused on Watson's argument that the malpractice claim was not discharged because it arose post-petition, citing § 727(b)'s language that only pre-petition debts are discharged and contending that her cause of action had not accrued at the time the bankruptcy case was filed. The BAP reviewed the case law on when a claim arises under the Bankruptcy Code.[26] Citing the Third Circuit *Frenville* case, it recognized the accrual theory as the minority view. Under this test, the right to payment must exist pre-petition before a claim can exist and the right to payment is determined by resort to when a claim accrues under state law.[27] Instead, the BAP adopted the

---

[24] During the pendency of the bankruptcy, debtor admitted that he had committed malpractice in the handling of Watson's employment lawsuit. Debtor did not, however, list Watson as a creditor.

[25] Watson failed to establish any of the other § 523(a) exceptions to discharge.

[26] 264 B.R. at 695-96.

[27] *See In re M. Frenville Co., Inc.,* 744 F.2d 332 (3rd Cir. 1984), *cert. denied* 469 U.S. 1160 (1985). Despite being roundly criticized by other courts, *Frenville* and the accrual theory remain the law in the Third Circuit, notwithstanding the subsequent passage of § 524(g) and (h) providing for trusts and channeling injunctions to deal with future claims. *See Jones v.*

Case 05-05591    Doc# 73    Filed 07/07/06    Page 13 of 33

conduct theory which states that a claim arises at the time of the debtor's conduct giving rise to the alleged liability.[28] If the debtor's conduct occurred pre-petition, the claim is a pre-petition claim and discharged by § 727(b). The BAP concluded that Watson had a contingent claim against the debtor at the moment the debtor engaged in the conduct that formed the basis for malpractice liability; since that occurred pre-petition, Watson's malpractice claim was a pre-petition claim. The BAP interpreted the federal law definition of claim under the Bankruptcy Code and rejected the use of state law to determine when a cause of action accrues.[29]

The Court notes that *Parker* is factually distinguishable on several fronts. One, the determination of a pre-petition claim was presented in the context of a no asset chapter 7 case filed by an individual debtor. The current case is a chapter 11 corporate reorganization case and arises in the context of a confirmed plan of reorganization.[30] Two, the claimant in *Parker* was identifiable at the time the bankruptcy petition was filed; the debtor simply failed to list Watson as a creditor. The claimant and debtor had a pre-petition attorney-client relationship, the act of malpractice occurred pre-petition, and the injury was sustained pre-petition. In the current case, Jesse had no pre-petition relationship or contact with Chance and had no pre-petition exposure to the Chance manufactured product, the Zipper. Because Jesse did not ride the Zipper and sustain injury until

---

*Chemetron Corp.,* 212 F.3d 199 (3rd Cir. 2000); *In re ANC Rental Corp.*, 341 B.R. 178 (Bankr. D. Del. 2006).

[28] *See Grady v. A.H. Robins Co., Inc.,* 839 F.2d 198 (4th Cir. 1988), *cert. denied* 487 U.S. 1260 (1988).

[29] § 101(5).

[30] The protection afforded unscheduled creditors by § 523(a)(3)(A) is unavailable against corporate debtors. Debts owing to creditors who are not scheduled and who lack notice of debtor's bankruptcy are excepted from an *individual* debtor's discharge.

after confirmation, Jesse was not an identifiable claimant during the bankruptcy. It was impossible for Chance to have scheduled Jesse as a creditor; it could not even have identified a class of future claimants who were likely to ride the Zipper and suffer injury. Three, in *Parker*, a pre-petition malpractice claim was discharged. In this case, debtors purport to have extinguished a future products-liability suit before the tort has occurred.

The BAP noted in a footnote a third line of cases for determining when a claim arises – "the narrow conduct" theory.[31] This theory is sometimes referred to as the "pre-petition relationship theory." Under this theory a claim arises at the time of the debtor's conduct giving rise to the liability "*only if* the claimant had a specific [pre-petition] relationship with the debtor at the time the conduct occurred" or the claim was "within the 'fair contemplation of the parties' at the time of the bankruptcy."[32] Observing that in *Parker* Watson would satisfy the pre-petition relationship in any event because Watson's claim involved pre-petition legal representation, the BAP declined to decide whether this third theory for determining the existence of a claim should be adopted.

> Because the attorney/client relationship between the two parties here would meet the criteria of either test, we do not reject this line of cases [the narrow conduct theory], nor will we speculate in this case on whether the conduct theory should be so narrowed.[33]

---

[31] 264 B.R. at 697, n. 12.

[32] *See Epstein v. Official Comm. Of Unsecured Creditors of Estate of Piper Aircraft Corp. (In re Piper Aircraft Corp.)*, 58 F.3d 1573 (11th Cir. 1995); *California Dep't of Health Services v. Jensen (In re Jensen),* 995 F.2d 925 (9th Cir. 1993); *Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268 (5th Cir. 1994) (Products liability claimant did not have claim at time of chapter 11 debtor's bankruptcy filing or confirmation where mobile home fire occurred two years after confirmation; the design and manufacture of mobile home resulted in no tortious consequence until the fire; there was no evidence in the record of any pre-petition contact, privity, or other relationship with debtor.)

[33] 264 B.R. at 697, n. 12.

15

In reviewing and affirming the *Parker* decision, the Court of Appeals adopted the BAP's reasoning. The Court of Appeals likewise did not decide which version of the conduct theory to adopt because both the conduct theory and the narrow conduct theory were met under the facts of that case.[34]

As conceded by Chance and CRM in their brief, the fact pattern not present in *Parker* is now squarely presented to the Court by this case.[35] While Chance and CRM argue for the conduct theory, Jesse advocates the narrow conduct or pre-petition relationship theory. As the Court reads *Parker,* both the BAP and Court of Appeals opinions admit of the possibility that the Tenth Circuit could adopt the narrow conduct or pre-petition relationship theory. The Court now looks to the cases from other jurisdictions applying the conduct and pre-petition relationship theories to determine whether Jesse had a claim that was discharged by the Confirmation Order.

## II.    The Conduct Theory vs. the Pre-Petition Relationship Theory

An examination of many of the cases that apply the basic conduct theory in determining whether a claim is a prepetition claim reveals that unlike the case at bar, nearly all involved claimants who had some pre-petition contact, exposure to, or relationship with the debtor or debtor's product such as that existing in *Parker*. They do not involve contacts or relationships that first occur *after* confirmation of a chapter 11 plan of reorganization. These cases, like *Parker*, are thus factually distinguishable and not particularly helpful in analyzing the question of whether a post-confirmation relationship or contact with a defective product falls within the definition of a claim under the Bankruptcy Code.

---

[34] 313 F. 3d at 1269, n. 1.

[35] Dkt. 60, p. 7.

16

A brief review of some of these cases illustrates the point.  In *In re Johns-Manville Corp.*[36] the bankruptcy court held that claimants' third party claims for indemnification and contribution against chapter 11 debtor were pre-petition claims and barred by the automatic stay where the claimants purchased and used debtor's products Flex Board panels and Rescon in pre-petition construction projects and even corresponded with debtor pre-petition concerning likely litigation and their right to indemnity for damages connected with replacement of the defective products.[37]

In *In re Edge*[38] Judge Lundin held that claimant's dental malpractice claim was a pre-petition claim subject to the automatic stay where the alleged negligent treatment occurred pre-petition but the patient did not discovery the negligent treatment until after the dentists had filed their chapter 7 petitions.  Undiscovered pre-petition negligence constituted a claim for bankruptcy purposes.

In *In re A.H. Robins Co., Inc.*[39] the bankruptcy court held that claimant's Dalkon Shield claim arose when the allegedly defective intrauterine device was inserted in claimant.  Since the Dalkon Shield was inserted before debtor manufacturer and seller filed its voluntary chapter 11 petition, the claim arose pre-petition and was stayed by § 362(a)(1), even though the claimant was unaware of  her injury and its cause until after the bankruptcy filing.  A claimant's "right to payment" arises under § 101(5) "when the acts giving rise to the alleged liability were performed."[40]

---

[36]  57 B.R. 680 (Bankr. S.D. N.Y. 1986).

[37]  *See also In re Black*, 70 B.R. 645 (Bankr. D. Utah 1986) (rejecting the state law accrual theory of *Frenville* and applying a conduct test where the indemnification/contribution claim arose out of a prepetition business transaction).

[38]  60 B.R. 690 (Bankr. M.D. Tenn. 1986).

[39]  63 B.R. 986 (Bankr. E.D. Va. 1986).

[40]  *Id.* at 994.  *See also In re Hudson Oil Co., Inc.*, 100 B.R. 72 (Bankr. D. Kan. 1989) (Lessor's indemnification claim against debtor-lessee arising from debtor's violation of

17

In none of the above cases did the courts mention or discuss the narrow conduct or pre-petition relationship theory. But in each case, the courts implicitly applied the pre-petition relationship test finding that the claimant had some pre-petition use, relationship, or exposure to the debtor's allegedly defective product or received pre-petition treatment from the debtor. Judge Lundin apparently believed in *Edge, supra*, that this factor is critical to his analysis of whether a claim exists:

> I believe that the 1978 Bankruptcy code recognizes a "right of payment" for the victim of a debtor's prepetition misconduct *at the earliest point in the relationship between victim and wrongdoer.* Though this right to payment may not be manifested as a right of access to other courts and though it be unmatured and contingent, it is a charge upon the wrongdoer and a demand inherent in the victim from the moment of the wrongful act.[41]

In none of these cases did claimants lack some pre-petition relationship to the debtor.[42] They were first exposed to or used an allegedly defective product pre-petition. In contrast here, Jesse lacked the pre-petition relationship to debtor. The earliest point in Jesse's relationship with debtor was post-petition, and even more extreme, post-confirmation. Jesse was an unknown and unknowable future tort victim when Chance filed its chapter 11 bankruptcy. Jesse's "right to payment" only arose that fateful day when he attended the carnival in Maryland and rode the Zipper.

---

environmental law was pre-petition claim even though lessor did not learn of contamination to property until after bankruptcy filed; debtor operated a gasoline service station on premises pre-petition, allowing gasoline to seep from underground storage tanks); *In re Hassanally*, 208 B.R. 46 (9th Cir. BAP 1997) (Negligent construction claim against chapter 7 debtor was pre-petition contingent claim and discharged by § 727(b) even though creditor discovered construction defect post-petition because debtor's conduct creating the construction defect occurred pre-petition.).

[41] 60 B.R. at 699 [Emphasis added].

[42] *See Epstein v. Official Comm. Of Unsecured Creditors (In re Piper Aircraft Corp.)*, 58 F.3d 1573, 1577 (11th Cir. 1995) (Noting that cases applying the conduct test for determining whether party has preconfirmation claim presume some prepetition relationship between debtor's conduct and claimant).

18

Several courts, including the Second, Fifth and Eleventh Circuits, have applied the pre-petition relationship test, requiring some pre-petition relationship between the claimant and the debtor such that claimant had some pre-petition contact with debtor or exposure to or use of debtor's product.[43]  The Eleventh Circuit Court of Appeals has refined the relationship test even further by focusing on the relationship between claimant and debtor's product occurring *pre-confirmation*, thus catching those claimants that have contact with the product post-petition but prior to confirmation.[44]

The Court finds *In re Kewanee Boiler Corp.*[45] somewhat analogous to the case here although even it is factually distinguishable.[46]  That case involved a post-confirmation claim and lawsuit arising out of plaintiff's burn injuries from a boiler manufactured and installed pre-petition by debtor.  *Kewanee* does not involve mass tort litigation concerning the debtor's product (boilers), and

---

[43]  *See Epstein,* 58 F.3d 1573 (11th Cir. 1995) (Holding that future product liability claimants defined as "all persons, whether known or unknown, born or unborn" who may assert post-confirmation claims against debtor or its successor based in whole or in part upon events occurring after confirmation did not have claims under § 101(5); court disallowed proof of claim filed by court appointed legal representative of the future claimants); *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268 (5th Cir. 1994) (Wrongful death product liability action arising out of mobile home fire against successor corporation of debtor mobile home manufacturer was not a claim under Bankruptcy Code where mobile home fire occurred more than two years after confirmation of chapter 11 plan of reorganization; "claim" cannot be extended to include completely unknown and unidentifiable claimants.); *In re Chateaugay Corp.*, 944 F.2d 997 (2nd Cir. 1991) (EPA environmental claims for response costs under CERCLA against chapter 11 corporate debtor as a potentially responsible party were prepetition claims where the response costs concerned prepetition releases of hazardous waste, even though not all response costs had been incurred.).

[44]  *See Epstein, supra* at 1577.

[45]  198 B.R. 519 (Bankr. N.D. Ill. 1996).

[46]  Even *Kewanee* is slightly distinguishable on its facts from the current case.  The injured claimant worked at a school where the boiler had been installed.  The injured claimant operated and maintained the school's boiler for twenty years before the accident occurred.  Here, of course, Jesse, had never been on or around the Zipper before the date of the accident.

19

like the current case, presents a case where the injury manifested itself at the time of the accident. The key fact is that debtor's pre-petition acts allegedly injured a person after confirmation. In *Kewanee*, a school janitor suffered burn injuries while working on the school's boiler some 20 months after the debtor's chapter 11 plan was confirmed. The claimant subsequently brought a products liability lawsuit in Maine state court and debtor moved the bankruptcy court to enjoin the suit, contending that the janitor's suit was barred by the confirmed plan and § 524(a)(2).

The bankruptcy court in *Kewanee* concluded that the injured janitor had no pre-petition claim discharged by operation of § 524 because he had no "right to payment" at all prior to confirmation. Under § 101(5), the injured janitor's future claim was neither "contingent" nor "unmatured." The debtor owed no debt to the janitor pre-confirmation; until the accident occurred, the janitor had no "claim" against the debtor. The *Kewanee* court never mentions the pre-petition relationship test but did note that if the criticism of *Frenville*[47] were followed to its logical conclusion, the requirement in § 101(5) that a "claim" rest on a "right to payment" would be meaningless.[48]

Perhaps the most persuasive and instructive case reviewed by the Court is *In re Hoffinger Industries, Inc.,*[49] a future claim case identical to the situation here. The bankruptcy court held that the class of future claimants who were unknown to the chapter 11 debtor swimming pool manufacturer and who had not yet used or sustained injuries as a result of use of the manufactured pools, did not have claims subject to estimation.[50] The *Hoffinger* court emphasized that the

---

[47] 744 F.2d 332 (3rd Cir. 1984).

[48] *Id.* at 528.

[49] 307 B.R. 112 (E.D. Ark. 2004).

[50] *Id.* at 119. The class of claims which debtor sought to estimate consisted of claims for accidents that had not yet occurred, but may occur post-confirmation to persons unknown,

definition of "claim" as a "right to payment" requires it to examine whether a claim exists from the perspective of another party and not from the perspective of the chapter 11 debtor as an obligation to pay. It requires some prepetition nexus between the product and the actual and specific person harmed.

> The Code does not define "claim" from the chapter 11 debtor's perspective as an "obligation to pay" (which, if contingent, might imply a "we built a pool and one day we might have to pay someone injured by it" analysis). Viewed from the correct perspective, the focus must be on identifying that other party and protecting his or her due process rights. . . . The plain reading of the Code's "claim" definition . . . requires some logical prepetition nexus between the product and the actual and specific person harmed. In the absence of a suitable class-action basis, satisfaction of due process requires more than mere existence on planet Earth (and in this instance, perhaps the unborn) that puts the person harmed, *i.e., the claimant*, on notice that he or she has a claim.[51]

> * * *

> Claims require claimants, which Black's Law Dictionary defines as "[o]ne who asserts a right or demand, . . ." and which the Bankruptcy Code generally refers to as a "creditor," meaning an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10). If the debtor does not fully know who the claimants are, the claimants should at least know who they are. More importantly, "they" should at least exist to qualify as "claimants" holding "claims." The persons who may eventually be in [the class], including the future unborn, simply do not. The post confirmation person unknown, unborn, or about to take their first swimming lesson simply does not have a logical prepetition nexus to Hoffinger's products.[52]

> * * *

> [G]iven the proper reading of the Code's definition of "claim," the claimants are unidentifiable, unknown, and have absolutely no "right to payment" from the

related to the product sold or manufactured prior to the confirmation date.

[51] *Id.* at 117.

[52] *Id.* at 122.

21

debtor.[53]

The *Hoffinger* court concluded that the debtor's defined class of future claimants went too far.

> Just owning or eventually buying a preconfirmation produced pool, or currently or eventually living next to, near, or in the same state as someone who has, or post confirmation will have, one of the above, and maybe one day using it and being injured, is simply not enough.[54]

The Court believes the pre-petition relationship test, requiring some impact, exposure, use, or contact with debtor or debtor's product before a claim in bankruptcy exists is the better view and the majority view. The Court agrees that the statutory definition of claim under the Bankruptcy Code, while intended to be broadly defined, cannot be read to be totally without limit. Those cases holding that unknown future tort victims have prepetition claims based solely upon debtor's prepetition conduct and without any pre-petition relationship between the claimant and debtor interpret the definition of "claim" as an unlimited one and would mean that every person, including the unborn and unknown, would have a contingent claim so long as the alleged improper conduct of the debtor (negligence, failure to warn, defective design, etc.) occurred prepetition. The Court declines to give "claim" such an unlimited interpretation.

In addition, there is nothing in the record before this Court to indicate that this is a "mass tort" case such as the asbestosis litigation where there are generally known dangers associated with exposure to certain products and the debtor is cognizant of future unknown claimants who have been exposed, but whose injuries have not yet manifested themselves.[55] Nor is there evidence before the

---

[53] *Id.* at 123.

[54] *Id.* at 117.

[55] *In re Hoffinger Industries, Inc.*, *supra* at 117 ("[T]his is not a mass tort case based upon a product for which there is substantial authority, either through admissions or a body of judicial findings, that the product is intrinsically or inherently defective or dangerous such that,

22

Court concerning the number of claims or lawsuits that have been brought against Chance relating to the Zipper ride.[56]  Indeed, there is no evidence that debtor has previously been subjected to suit over its design or manufacture of the Zipper ride.  Simply put, there is nothing in this record to suggest that Chance could "conclude that an amorphous class of unmanifested [Zipper] claimants" existed at the time Chance filed its chapter 11 case.[57]  The Court might be inclined to view Jesse's claim differently if it were part of mass tort litigation.  There are means available to a debtor in bankruptcy to address future tort claims; Chance has not invoked such procedures here.[58]

Indeed, in reviewing the plan's language, the Court questions whether Chance truly intended to reach future unknown claimants.  Article 8 of the plan outlines the scope of the discharge to be granted by purporting to discharge "all *claims* or other debts [defined in § 101(12) as liabilities on claims] which arose, accrued, or *grew out of acts performed by the debtors before the Effective date* . . . ."[59]  While the emphasized language implies that any claim arising from the debtors' prepetition

---

similar to a class-action, users would be on notice that they had a claim.").

[56]  *In re Hoffinger Industries, Inc., supra* at 119 ("[T]he facts do not demonstrate a significant number of existing or probable claims unusual in the pool manufacturing industry. This simply is not a mass tort case with a 'mounting tide of claims . . .'").

[57]  *See In re Waterman Steamship Corp.*, 141 B.R. 552, 557 (Bankr. S.D.N.Y. 1992), *vacated on other grounds* 157 B.R. 220 (S.D.N.Y. 1993) (asbestosis claimants who were exposed pre-petition but whose injuries had not yet manifested themself held pre-petition claims that were discharged by the terms of the confirmation order).

[58]  *See* 11 U.S.C. § 524(g).  *See also In re Roman Catholic Archbishop of Portland in Oregon*, 2005 WL 148775 (Bankr. D. Or. Jan. 10, 2005) (appointment of a future claims representative to represent interests of unknown future claimants who were subjected to pre-petition sexual abuse); *In re Hoffinger Industries, Inc., supra* at 115 (Debtor's plan contained a channeling injunction similar to that provided for in § 524(g), enjoining products liability claims against the debtor or reorganized debtor and requiring claims to be made against a product liability fund created under the debtor's plan.).

[59]  Dkt. 492.

23

actions was intended to be covered, debtors' use of the word "claim," freighted with § 101(5)'s definition as a "right to payment," still implicates the considerations of the debtor's prepetition conduct and whether the purported "claimant" was exposed to that conduct or its consequences before or after confirmation.

Further, Article 10 of the plan expressly provides for the treatment of "post-petition, *pre-confirmation* products liability/personal injury" liabilities by treating them as prepetition claims.[60] This treatment is not, and does not purport to be broad enough to embrace claims like Jesse's. There is no mention of claims like Jesse's except for the conceptually limited "grew out of acts" language inserted in Article 8.

Unknown future claimants who have not had any pre-petition contact with debtor or debtor's product do not fit the definition of a "creditor" under the Bankruptcy Code. Section 101(10)(A) defines a creditor as an "entity that has a *claim* [right to payment] against the debtor *that arose at the time of or before the order for relief* concerning the debtor." The clear import of this definition is that a creditor must hold a pre-petition claim. In the case at bar, Jesse had no right to payment (even a contingent one) at the time Chance's order for relief was entered. Jesse had no contact with debtor or the Zipper ride when the order for relief was entered. Under Chance's conduct theory without some pre-petition relationship requirement, any person in the future who might ride the Zipper (or any other amusement ride) would have a pre-petition contingent claim.[61]

The Court concludes that the pre-petition relationship test is the better test for determining

---

[60]  *Id.*

[61]  The claim would be contingent not only on the person riding the Zipper but also being injured as a result of riding the Zipper.

whether an unknown future claimant has a claim that is subject to discharge under § 524 and the confirmation order. As applied here, Jesse had no claim that was discharged by the Confirmation Order. Jesse had no pre-petition relationship or contact with Chance or its product, the Zipper. Accordingly, Jesse's product liability claims against Chance and its successor CRM are not barred by the Confirmation Order and he may pursue his product liability claims in Maryland state court.

In addition, Jesse may pursue his claims against Richard Chance since he was not a chapter 11 debtor subject to the discharge injunction or the Confirmation Order.[62] No provision in Chance's plan purports to discharge or enjoin any claims against Richard Chance personally. In the answer to the amended complaint filed on behalf of all defendants, it is admitted that "the Confirmation Order does not extend the discharge or the injunction to Richard G. Chance as to any personal tort he may have committed prior to confirmation."[63] The Court is also unpersuaded that it should enjoin the separate state court action against Richard Chance to protect the debtor.[64]

Finally, to the extent Jesse's claims against CRM or the reorganized debtor are based upon post-confirmation conduct rather than pre-petition conduct, they would not be pre-petition claims that were discharged upon confirmation. As noted below, the Maryland state court is the appropriate

---

[62] *See* § 524(e). Neither the confirmed plan of reorganization nor the Confirmation Order purport to deal with claims against Chance's president, Richard Chance.

[63] Dkt. 44.

[64] Defendants cite *In re American Film Technologies, Inc.,* 175 B.R. 847 (Bankr. D. Del. 1994), a case where the debtor and debtor's current and former directors were sued *pre-petition* by a former officer arising out of the termination of his employment. In applying the automatic stay to enjoin the suit, the bankruptcy court was concerned with collateral estoppel and indemnification issues if the suit was allowed to proceed against the non-debtor directors but not the debtor. The case at bar is readily distinguishable in that the debtor's chapter 11 reorganization was concluded before Jesse brought suit in state court. The concerns that were present in *American Film* simply do not exist here.

25

forum to determine whether Jesse has stated claims against Chance and CRM based upon post-confirmation conduct.

With respect to Jolly Shows, the Court recognizes the parties' stipulation that Jolly Shows received notice of Chance's bankruptcy prior to confirmation and had a pre-petition relationship with Chance by virtue of its purchase of the Zipper ride in 1997. Chance argues that because of this notice and pre-petition relationship, Jolly Shows had pre-petition claims against Chance and CRM that were discharged by the Confirmation Order, notwithstanding the fact that Jesse's accident and injury had yet to occur.

Chance misapprehends the pre-petition relationship test. There must be some connection or nexus between the pre-petition relationship and the pre-petition conduct giving rise to the claim. This fine distinction was noted in *Epstein*:

> The prepetition relationship test . . . requires 'some prepetition relationship, such as contact, exposure, impact, or privity, *between the debtor's prepetition conduct and the claimant*' in order for the claimant to hold a § 101(5) claim. . . .
>
> The debtor's prepetition conduct gives rise to a claim to be administered in a case only if there is a relationship established before confirmation between an identifiable claimant or group of claimants and *that prepetition conduct.*[65]

In other words, the debtor's prepetition conduct (*i.e.* designing, manufacturing and selling an allegedly defective or dangerous product) must be the basis for liability. While the nature of the cross-claims which Jolly Shows seeks to assert against Chance and CRM is not entirely clear, Jolly Shows represents that it would assert tort-type indemnity and contribution theories. It is clear that Jolly Shows does not intend to assert cross-claims sounding in contract and arising out of its purchase of the Zipper in 1997. In short, there is no connection between Jolly Shows' prepetition

---

[65] 58 F.3d at 1577.

contractual relationship with debtor and the alleged prepetition conduct (negligence, failure to warn, defective design of Zipper) upon which Chance and Jolly Shows are sought to be held liable. Jolly Shows' prepetition contractual relationship with Chance is unrelated to Chance's alleged pre-petition product liability conduct. Absent this link between the prepetition conduct and the prepetition relationship, Jolly Shows had no claim under the pre-petition relationship test that was discharged by the Confirmation Order.

Finally, notwithstanding this Court's determination that Jesse and Jolly Shows did not have pre-petition claims that were discharged by the Confirmation Order under the facts existing here, the Court expresses no opinion with respect to the merits of the claims asserted in the Maryland product liability suits or defenses that may be available to Chance or other party defendants under applicable state law. The Court here is concerned only with the question of whether Jesse had a claim within the meaning of § 101(5) and whether that claim was discharged by the Confirmation Order or by operation of § 524. This is a different question and analysis than whether the cause of action may be barred by a state's statute of limitations, subject to a statute of repose, or barred by some other defense based upon state law. Those questions are left for the Maryland state court.

Similarly, it is not necessary for the Court to address the question of whether CRM has successor liability.[66] That question will also be squarely before the Maryland state court. Chance has made no attempt in its plan or Confirmation Order to provide for unknown future claimants, either via a § 524(g)-styled channeling injunction or by other means. In at least one case, a court has held that a debtor and its subsidiaries may not circumvent § 524(g) by seeking a declaratory

---

[66] The Court notes that CRM is not a party to this adversary proceeding.

judgment in the bankruptcy to limit successor liability.[67]  By seeking to enforce the discharge injunction, Chance and CRM effectively seek to do the same here.

The Court further notes that the "new entity" in this case, CRM, is wholly owned by defendant Richard G. Chance, who also owns 100% of the stock in the reorganized debtor Chance and is Chance's president.[68]  While the transfer of most, but not all, of the debtor's assets to CRM under the plan purports to be a "sale" pursuant to § 363(f), the consideration exchanged is CRM agreeing to assume liabilities owed to debtor's principal secured lender, with the reorganized debtor also remaining indebted thereon.[69]  In short, the business of the debtor will be carried on by CRM and the reorganized debtor, rendering Chance's denial of successor liability somewhat tenuous.[70]

---

[67]  *See In re G-I Holdings, Inc.*, 328 B.R. 691 (D.N.J. 2005) (Legal representative of asbestos claimants granted judgment on pleadings on debtor's declaratory judgment action that its subsidiaries had no successor liability.).

[68]  *See* Dkt. 491, Section V; Dkt. 492, Art. 4.

[69]  *Id.*  The reorganized debtor would continue in business to market certain product lines of the former debtors.

[70]  Successor liability may be imposed upon the successor corporation if the acquiring corporation was a mere continuation of the selling company.  *See Williams v. Bowman Livestock Equipment Co.,* 927 F.2d 1128, 1132 (10th Cir. 1991). *See also, Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994) (bankruptcy court lacked jurisdiction to enjoin postconfirmation products liability suit against chapter 11 debtor's successor); *In re Savage Industries, Inc.*, 43 F.3d 714 (1st Cir. 1994) (bankruptcy court could not enjoin state court products liability suit against debtor's successor where parties in interest were afforded no notice of transfer of assets or chapter 11 plan).

28

### III. Constitutionality of Discharging Unknown Future Tort Claims without Notice to Unknown Future Tort Claimants

Even if Jesse had a claim under § 101(5), the Court considers whether Chance could not constitutionally extinguish it without affording Jesse due process.[71]

The broad definition of "claim" does not empower the Court to ignore the dictates of constitutional law. As noted in *In re Fairchild Aircraft Corp.*[72]:

> "Claim" ought not do what is "not possible" in a court of law – it may not authorize courts to ride roughshod over due process and notions of fundamental fairness, for example. . . .
>      The immediate limitation this suggests is that, of necessity, no treatment which violates the due process rights of a claimant can be permitted to stand, regardless the purported breadth of the definition of bankruptcy claim . . .

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection."[73] A creditor has a right to due process in bankruptcy proceedings, including reasonable notice of the confirmation hearing before his claim is barred.[74] Applying Supreme Court precedent,

---

[71] *See Jones v. Chemetron Corp.,* 212 F.3d 199, 209-210 (3rd Cir. 2000) (Without deciding whether claim existed, court held that potential claim of an unborn child not represented in bankruptcy is not discharged by a confirmation order; when no action is taken to address the interests of unborn future claimants in a chapter 11 reorganization, the reorganized debtor cannot later avoid liability to such claimants by arguing that their claims were discharged in bankruptcy.)

[72] 184 B.R. 910, 927 (Bankr. W. D. Tex. 1995), *vacated on other grounds* 220 B.R. 909 (Bankr. W.D. Tex. 1998).

[73] *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306 (1950). These due process requirements apply equally to bankruptcy proceedings. *See Turney v. Federal Deposit Ins. Co.,* 18 F.3d 865, 868 (10th Cir. 1994).

[74] *New York v. New York, New Haven & Hartford R.R. Co.,* 344 U.S. 293 (1953). *See also, In re Barton Industries, Inc.,* 104 F.3d 1241 (10th Cir. 1997) (Secured creditor did not receive adequate notice that its security interest would be extinguished by operation of the bankruptcy plan.).

29

the Tenth Circuit Court of Appeals held in *Reliable Electric Co., Inc. v. Olson Construction Company*, that notwithstanding the language of § 1141, "the discharge of a claim without reasonable notice of the confirmation hearing [violates] the Fifth Amendment to the United States Constitution."[75]  Accordingly, a creditor without notice of the confirmation hearing cannot be bound by the terms of the confirmed plan.[76]

The due process requirements for unknown future claims in bankruptcy was discussed in a 2004 article in the *American Bankruptcy Law Journal*.[77]  The author recognized the requirements of adequate notice under the Due Process Clause and discussed the means available to give adequate notice to unknown future claimants in bankruptcy, holders of claims who are not readily identifiable by the debtor and holders of claims who may be injured in the future by prepetition conduct of the debtor.  The author conceded the inadequacy of constructive notice (*i.e.* publication) to the holders of unknown future claims:

> Some of the future claimants may not be living persons at the time the notice is given, so they are not necessarily capable of seeing it.  If they are alive and actually see the notice, they could not recognize themselves as affected in any way by the bankruptcy case and will, therefore, take no action to ensure their interests are represented.  The purpose behind requiring notice to creditors is to provide them the "opportunity to be heard" which is "the fundamental requisite of due process of law." Such a notice by publication is an exercise in futility as applied to creditors who are not only unknown to the debtor, but are also unknown to themselves.  It cannot

---

[75]  726 F.2d 620, 623 (10th Cir. 1984).

[76]  The appellate court rejected the argument that the creditor's participation in the confirmation hearing would not have changed the outcome of the hearing and approval of the plan.  726 F.2d at 623, n. 5.  ("[E]ven if Olson had voted to reject the . . . Plan, the Plan would still have been approved. . . . This . . . does not justify depriving Olson of its guaranteed due process right." [citation omitted]).

[77]  Laura B. Bartell, *Due Process for the Unknown Future Claim in Bankruptcy – Is this Notice Really Necessary?*, 78 Am. Bankr. L.J. 339 (2004).

possibly define the requirements of the Due Process Clause.[78]

The solution advocated by the author was to appoint a future claims representative to act as unknown future claimants' guardian ad litem and to give actual notice to the future claims representative.[79]

As applied to the facts here, Chance made no effort to give *any* notice to Jesse of its bankruptcy or of its purported attempt to discharge unknown future claims resulting from its manufacture and sale of amusement rides. No future claims fund or trust was established under the plan to fund products liability claims arising in the future.[80] No future claims representative was provided for in the plan to represent the interests of unknown future claimants. No notice was given to a future claims representative. Unlike some of the cases cited by debtor, Jesse was afforded absolutely no notice of Chance's bankruptcy or the confirmation hearing. He was totally deprived of an opportunity to participate in the proceedings.

Chance argues that even if it failed to afford due process to Jesse, that error was harmless because the plan would not have changed and Jesse's participation in the confirmation process would not have resulted in a different outcome. Chance cites several cases for the harmless error rule but most involve procedural irregularities to a party participating in the bankruptcy proceeding; none of them involve the total denial of due process to a future tort claimant and the extinguishing of an unknown claim that has yet to accrue.

---

[78] *Id.* at 354.

[79] *Id.* at 355-56. The author rejected the notion, however, that adequate representation is a substitute for inadequate notice under the Due Process Clause.

[80] *See In re UNR Industries, Inc.,* 224 B.R. 664 (Bankr. N.D. Ill. 1998); *In re Kewanee Boiler Corp., supra; In re Fairchild Aircraft Corp., supra;* § 524(g)(2)(B)(I).

31

The harmless error rule applies to procedural irregularities in bankruptcy that do not affect substantial rights.[81]   The Tenth Circuit Court of Appeals has rejected Chance's harmless error argument in both *Turney*[82] and *Reliable Electric*.[83]   Other courts have likewise held in the bankruptcy context that a denial of constitutional due process is never harmless error.[84]

Where there has been no effort to give any notice to Jesse or a future claims representative, the Court cannot conclude that the total denial of due process was harmless error.[85]   Even if Jesse is deemed to have held a "claim" at the time of Chance's bankruptcy and confirmation hearing, the discharge of that claim without giving Jesse reasonable notice and the opportunity to be heard on his claim violates due process.

---

[81]   *See* Fed. R. Bankr. P. 9005 which makes Fed. R. Civ. P. 61 harmless error rule applicable in bankruptcy.  *See e.g. Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2nd Cir. 1988) (harmless error rule applied to irregularities in voting procedures); *In re Mandalay Shores Co-op. Housing Ass'n, Inc.*, 63 B.R. 842 (N.D. Ill. 1986) (noting distinction between shortened notice and total denial of *any* right to be heard; harmless error analysis applied to shortened notice); *In re Robintech, Inc.,* 863 F.2d 393 (5th Cir. 1989) (two-day delay in notice of claim bar date was harmless error.)

[82]   *Turney v. Fed. Deposit Ins. Corp.,* 18 F.3d 865 (10th Cir. 1994) (In bankruptcy proceedings, creditors have constitutional right to be heard on their claims and the denial of that right is 'the denial of due process which is never harmless error,' *citing In re Boomgarden,* 780 F.2d 657, 661 (7th Cir. 1985)).

[83]   *Reliable Elec. Co., Inc. v. Olson Construction Co.,* 726 F.2d 620, 623 n. 5 (10th Cir. 1984) (Fact that other creditors overwhelmingly approve the plan does not justify depriving Olson of its guaranteed due process rights).

[84]   *In re George W. Myers Co.,* 412 F.2d 785 (3rd Cir. 1969); *Republic Nat. Bank of Dallas v. Crippen*, 224 F.2d 565 (5th Cir. 1955).

[85]   *Cf. Turney,* 18 F.3d at 869 (chapter 11 debtor not deprived of due process in connection with confirmation of creditor's plan where debtor was present and represented by counsel at all proceedings; debtor's contentions reflected a failure to comprehend what was set before him.).

32

Conclusion

The Court adopts the "pre-petition relationship test" for determining whether an unknown future product liability tort claimant has a prepetition claim that is discharged upon confirmation of a chapter 11 debtor's plan of reorganization and by operation of § 1141 and § 524. Applying this test and the language of "claim" under the Bankruptcy Code, the Court concludes that neither Jesse nor Jolly Shows held tort claims at the time the Confirmation Order was entered. Neither Jesse nor Jolly Shows had a "right to payment" at the time of the confirmation hearing where Jesse's first and only contact with Chance's product and the resultant simultaneous injury occurred a month after confirmation. Jesse and Jolly Shows may proceed with prosecution of their tort-based claims against Chance, CRM, and Richard Chance in Maryland state court.

The Court further concludes that even if Jesse held a pre-petition claim that was discharged by the Confirmation Order entered May 16, 2002, the discharge of that claim violated Jesse's due process rights guaranteed by the United States Constitution where no notice of Chance's bankruptcy or the confirmation hearing was afforded him.

Accordingly, Debtors' motion to enjoin the Maryland state court lawsuits and to find plaintiffs in contempt for violation of the Confirmation Order and the discharge injunction is DENIED.

In the adversary proceeding, JUDGMENT should be entered in favor of plaintiffs and intervenor on the adversary complaint for a determination of the dischargeability of their respective claims asserted in Maryland state court. A Judgment on Decision will issue this day.

# # #

33